Terence L. Kindlon, an attorney duly admitted to practice in the Northern District of New York, under penalty of perjury, affirms the following:

1. I have reviewed, among other things: (1) my file for United States v. Abdelmaji Lababneh, 1:14-cr-189 (MAD), a case in which I represented Mr. Lababneh; (2) Mr. Lababneh's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, filed on July 5, 2017 ("Lababneh Mot."), (3) Mr. Lababneh's July 14, 2017 letter in opposition to the government's request for an order finding that the attorney client privilege has been waived, (4) my memory of my dealings with Mr. Lababneh, and (5) the July 14, 2017 order of the Hon. Mae A. D'Agostino, U.S. District Judge, ruling that I am no longer bound to protect any so-called attorney-client communications, insofar as they are relevant to the claims made and defenses raised on account of Mr. Lababneh's motion.

2. Mr. Lababneh claims that, while he was detained awaiting trial, and considering the government's plea offer, I told him to "take the deal and you go home today." ("Lababneh Mot. at 2). This is the one and only correct part of Mr. Lababneh's claims. I did tell Mr. Lababneh that if he accepted the government's plea offer he likely would go home on the day of his guilty plea, based upon representations made to me by the Assistant United States Attorney that the government would not oppose his release pending sentencing in order to permit certain activities. And the court did in fact order Mr. Lababneh's release from detention, with conditions, on the day of his plea.

3. Mr. Lababneh further alleges in his motion that I told him "'not to worry' you will get no more than probation or six months to a year because synthetic marijuana was added to the list while [Mr. Lababneh] was in Jordan." (Lababneh Mot. at 2). Contrary to Mr. Lababneh's assertion, I never told Mr. Lababneh that that he would receive a sentence of no more than probation, or six months, or a year. Rather, on several occasions I explained to Mr. Lababneh that we were not in a state court, where such plea bargains for specific sentences were possible, but that we were in federal court, and thus were dealing with federal sentencing guidelines, which were used to calculate the range of his sentence and could be far greater. I informed Mr. Lababneh that his guidelines range could be as high as 210 to 240 months of imprisonment if he did not receive credit for acceptance of responsibility, or 151-188 months if he did receive credit for acceptance of responsibility – due to the way the sentencing guidelines scored the weight of the synthetic cannabinoid in this case. I also explained that, while I would make arguments at sentencing concerning both the fact that synthetic cannabinoid was added to the list of controlled substances while he was in jail, and the fact that its 1:167 conversion ratio for purposes of the guidelines overrepresented the seriousness of the offense, the court would decide his sentence based, in part, on the guidelines. I also conveyed to Mr. Lababneh the government's indication that, if the case proceeded to trial, the government would seek to supersede the indictment with an additional count charging distribution of a controlled substance analogue, which would have increased the total statutory maximum sentence to 40 years and potentially increased the guidelines range and his sentence.

4. Mr. Lababneh further alleges in his motion that I "failed to negotiate a decent plea bargain, then cajoled him to take the deal, and then lied to him about the possible jail time that he

would receive." (Lababneh Mot. at 3). I never "cajoled" Mr. Lababneh into accepting the government's plea offer. Nor did I ever lie to Mr. Lababneh about the possible jail time he would receive. I did make efforts to obtain a more favorable plea offer from the government. These efforts resulted in the government's agreement to modify the plea agreement so as to preserve Mr. Lababneh's right to challenge on direct appeal a decision by the District Court to calculate the offense level using the 1:167 conversion ratio. However, the Assistant United States Attorney made clear to me that no more favorable plea offer would be forthcoming from the government. I conveyed this to Mr. Lababneh.

5. Mr. Lababneh further alleges in his motion that I told him "that he would not get a lot of jail time," and that "he would get time served, probation as others had received, or six months or less." (Lababneh Mot. at 4). I never told him these things.

6. Mr. Lababneh further alleges in his motion that I "promised him that he would go home immediately and that he would only get 5 or 6 months despite that fact that his plea agreement, which [Mr. Lababneh] could not even read, said up to 20 years and a fine of up to $1,000,000." (Lababneh Mot. at 5). Again, almost all of this is incorrect. As indicated above, I did, correctly, tell Mr. Lababneh he would likely be released following his guilty plea, in accordance with the government's representation that it would not seek his continued detention. And Mr. Lababneh was released. However, the assertion that I promised Mr. Lababneh that he would receive a sentence of only 5 or 6 months, is incorrect.

7. In regard to his potential sentence, Mr. Lababneh—who freely admitted to me during our discussions of his case that he had engaged in the conduct alleged by the Government—consistently expressed difficulty in both understanding and/or accepting that such conduct constituted a serious crime. This cognitive dissonance, whether it was real or feigned, placed me in the absurd position of having to try to persuade my client that the possession and distribution of synthetic marijuana, while it might be a relatively minor offense under the law of New York State, was a very serious crime under the laws of the United States.

8. Mr. Lababneh and I extensively discussed possible sentences that could be imposed. In this regard we focused on the potential benefit of his acceptance of responsibility and of a motion by the Government pursuant to USSG 5K1.1 and what such a motion could mean in connection with the length of his sentence. Our discussions in this regard conclusively demonstrated to me that my client clearly had a sophisticated understanding of the nature and potential of such a motion.

9. Although Mr. Lababneh claims he could not read the plea agreement, this is utter nonsense. I know from my extensive conversations with Mr. Lababneh that even though English was not his first language, he was quite fluent in English.

10. When the time came, I provided Mr. Lababneh a copy of the plea agreement, observed him read it and we went through it line by line, discussing its terms and conditions in microscopic detail. My client *never* claimed to be unable to read or understand the plea agreement.

11. Concerning his ability to communicate, after his guilty plea, when Mr. Lababneh was released from the Rensselaer County Jail, my law partner and wife, Laurie Shanks, and I picked him up in our family car and drove him from Troy to the Albany bus station for his trip to New York City. Along the way we three had a lively and spirited discussion, in English.

12. In sum, as a result of all of my interactions with Mr. Lababneh, by the time he changed his plea, it was eminently clear to me that he spoke and understood English, that he grudgingly accepted the realities of his criminal conduct, that he was pleading guilty because he was guilty and that he understood how the federal sentencing guidelines applied in his case.

Respectfully submitted,

Dated:  August 30, 2017

s/Terence L. Kindlon
_____

Terence L. Kindlon